This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-39471**

**THE GEO GROUP INC.,**

Protestant-Appellant,

v.

**NEW MEXICO TAXATION & REVENUE DEPARTMENT,**

Respondent-Appellee,

**IN THE MATTER OF THE PROTEST OF THE GEO GROUP INC. TO ASSESSMENT ISSUED UNDER LETTER ID NO. L0928375088.**

**APPEAL FROM THE ADMINISTRATIVE HEARING OFFICE**
**Brian VanDenzen, Hearing Officer**

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Charles K. Purcell
Albuquerque, NM

for Appellant

Peifer, Hanson, Mullins & Baker, P.A.
Mark T. Baker
Matthew E. Jackson
Albuquerque, NM

for Appellee

## MEMORANDUM OPINION

**HANISEE, Judge.**

**{1}**     The Geo Group, Inc. (Taxpayer) is a private prison company that contracted with two counties to build and maintain two prisons, then subsequently supervise, house, and provide services to prisoners within the New Mexico Corrections Department (NMCD). Taxpayer had claimed a deduction for many of the gross receipts taken in service of the aforementioned contracts under NMSA 1978, Section 7-9-47 (1994, amended 2021)[1] on grounds that the receipts were for the resale of a license rather than that of services. Though the Department of Taxation and Revenue (the Department) had previously approved this deduction, the Department subsequently conducted an assessment and audit of Taxpayer and, reversing course, determined that Taxpayer was ineligible to claim the deduction.

**{2}**     Taxpayer protested the Department's assessment and, following an administrative merits hearing, the administrative hearing officer (AHO) issued a fifty page written decision and order including findings of fact and conclusions of law. The AHO found in pertinent part: (1) Taxpayer was not entitled to the deduction under Section 7-9-47 because the contracts between Taxpayer and the counties were for the sale of services rather than the resale of licenses; (2) the good faith, safe harbor provision under NMSA 1978, Section 7-9-43(A) (2011, amended 2018)[2] was inapplicable in Taxpayer's protest because Taxpayer did not accept nontaxable transaction certificates (NTTCs) from the counties in good faith; and (3) Taxpayer was not entitled to equitable relief because the Department's actions did not "rise to the level of affirmative misconduct or . . . overreach[ing]" needed to support equitable relief. Taxpayer appeals the decision and order of the AHO, asserting error as to the above findings.

**{3}**     Two recent opinions guide our analysis of two of Taxpayer's arguments. First, this Court's nonprecedential memorandum opinion in *CCA of Tennessee, LLC v. N.M. Tax'n & Revenue Dep't*, No. A-1-CA-37548, mem. op. (N.M. Ct. App. Jan. 21, 2021) (nonprecedential) (*CCA of Tennessee I*), *rev'd by CCA of Tennessee, LLC v. N.M. Tax'n & Revenue Dep't*, ___-NMSC-___, ___ P.3d ___ (S-1-SC-38681, Jan. 16, 2024) (*CCA of Tennessee II*). Second, our Supreme Court's opinion in *CCA of Tennessee II*, ___-NMSC-___.

**{4}**     In *CCA of Tennessee I*, this Court addressed a situation similar to that of the instant case: the taxpayer, a private prison corporation that contracted with a county to provide facilities and services to operate prisons, sought and was approved for a refund of gross receipts tax paid for multiple reporting years. *CCA of Tennessee I*, A-1-CA-37548, mem. op. ¶¶ 2, 4. Years after the approval of the taxpayer's refund, the Department conducted an audit of the taxpayer and found—as happened here—that the taxpayer was not entitled to the previously issued refund. *Id.* ¶ 7. The Department thereafter assessed the taxpayer for gross receipts tax, withholding tax, penalties, and interest. *Id.* The taxpayer filed a protest of the Department's assessment, which was

---

[1]The relevant activity in this case occurred before Section 7-9-47 was amended in 2021, and further reference to the statute is to the 2012 version.

[2]The relevant activity in this case occurred before Section 7-9-43(A) was amended in 2018, and further reference to the statute is to the 2012 version.

later denied by an AHO. *Id.* On appeal by the taxpayer, this Court addressed two issues: (1) whether the AHO erred as a matter of law in determining that the contracts between the taxpayer and the county were for the sale of services, rather than for the sale of a license, and the taxpayer therefore did not qualify for a deduction under Section 7-9-47; and (2) whether the AHO erred in denying the taxpayer the "safe harbor" protection in Section 7-9-43(A) on the basis that the taxpayer did not accept the NTTC in good faith. *CCA of Tennessee I*, A-1-CA-37548, mem. op. ¶¶ 8, 23, 27. As to the first issue, this Court concluded that the AHO had properly applied the "predominant ingredient" test, set forth in NMSA 1978, Section 7-9-3(M) (2007, amended 2023),[3] in determining that the activities contemplated by the contracts between the taxpayer and the county "involve[d] predominantly the performance of a service as distinguished from selling . . . property" and that sufficient evidence supported such a conclusion. *CCA of Tennessee I*, A-1-CA-37548, mem. op. ¶¶ 12, 22 (internal quotation marks and citation omitted); *Rauscher, Pierce, Refsnes, Inc. v. N.M. Tax'n & Revenue Dep't*, 2002-NMSC-013, ¶ 36, 132 N.M. 226, 46 P.3d 687 (explaining that the "predominant ingredient" test "is applied when a transaction includes both the performance of services and the sale or lease of property to determine which of these constitutes the predominant ingredient of the transaction"). This Court affirmed the AHO's decision as to this first issue. *CCA of Tennessee I*, A-1-CA-37548, mem. op. ¶¶ 12, 22, 28. As to the second issue regarding good faith acceptance of the NTTCs, this Court concluded that the AHO erred in denying the taxpayer the safe harbor protection provided by Section 7-9-43(A) and reversed on such basis. *Id.* ¶¶ 27-28.

**{5}** Thereafter, the Department petitioned our Supreme Court for certiorari review of *CCA of Tennessee I*, which granted such petition. This Court then issued an order staying the instant appeal pending our Supreme Court's review of *CCA of Tennessee I*. In January 2024, our Supreme Court filed *CCA of Tennessee II*, reversing only that aspect of *CCA of Tennessee I* that reversed the AHO as to the issue of safe harbor protection under Section 7-9-43(A), and thus affirmed the AHO's underlying decision in full. *Id.* ¶¶ 1, 3, 9, 28. Notably, the petition for certiorari review did not include an appeal of this Court's affirmance of the AHO's determination that the contracts between the taxpayer and the county related to the sale of services, rather than to the sale of a license, and our Supreme Court therefore did not address that issue in affirming the AHO's decision. *See CCA of Tennessee II*, ___-NMSC-___, ¶¶ 9 n.3, 28.

**{6}** Here, *CCA of Tennessee II*—and to some extent *CCA of Tennessee I*—governs our analysis of two of the three issues Taxpayer raises on appeal. Indeed, Taxpayer raises two issues that are closely related to those affirmed in *CCA of Tennessee II*: here, Taxpayer argues that the AHO erred in concluding that (1) Taxpayer's contracts with the counties were for the sale of services rather than for resale of licenses—and therefore Taxpayer was not entitled to the requested refund, and, (2) the safe-harbor provisions of Section 7-9-43(A) were unavailable to Taxpayer because Taxpayer did not

---

[3]The relevant activity in this case occurred before Section 7-9-3(M) was amended in 2023, and further reference to the statute is to the 2007 version.

receive the NTTCs in good faith. We address these issues in turn, as well as Taxpayer's additional argument concerning equitable relief.

**{7}** "We will set aside a decision and order of an administrative hearing officer only if it is '(1) arbitrary, capricious or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3) otherwise not in accordance with the law.'" *CCA of Tennessee II*, ___-NMSC-___, ¶ 10 (quoting NMSA 1978, § 7-1-25(C) (2015)). "In reviewing the administrative hearing officer's decision we apply a whole-record standard of review." *CCA of Tennessee II*, ___-NMSC-___, ¶ 10 (internal quotation marks and citation omitted). "We view the evidence in the light most favorable to the hearing officer's decision to determine whether that decision is supported by substantial evidence." *Id.*

**{8}** Regarding the first issue, Taxpayer contends—as did the taxpayer in *CCA of Tennessee I*—that the central error by the AHO in determining whether Taxpayer is entitled to deductions under Section 7-9-47 was that the AHO incorrectly applied the "predominant ingredient" analysis under Section 7-9-3(M) to find that the contracts at issue governed the sale of services rather than the resale of licenses. *See CCA of Tennessee I*, A-1-CA-37548, mem. op. ¶ 8. The 2012 version of Section 7-9-47 in effect at the time of Taxpayer's protest stated that

> [r]eceipts from selling tangible personal property or licenses may be deducted from gross receipts or from governmental gross receipts if the sale is made to a person who delivers a nontaxable transaction certificate to the seller. The buyer delivering the nontaxable transaction certificate must resell the tangible personal property or license either by itself or in combination with other tangible personal property or licenses in the ordinary course of business.

In other words, as the AHO explained in its decision, a deduction under Section 7-9-47 "applies when Taxpayer establishes three conditions. First, Taxpayer must be selling a license[, rather than services]. Second, the buyer of that license must deliver a NTTC to Taxpayer. And third, the buyer of Taxpayer's license must resell that license in the ordinary course of business." The version of Section 7-9-3(M) in effect at the time of Taxpayer's administrative protest provided in relevant part:

> "[S]ervice" means all activities engaged in for other persons for a consideration, which activities involve predominantly the performance of a service as distinguished from selling or leasing property. . . . In determining what is a service, the intended use, principal objective or ultimate objective of the contracting parties shall not be controlling.

This Court has recognized, as we did in *CCA of Tennessee I*, A-1-CA-37548, mem. op. ¶ 11, that the Legislature's adoption of the "predominant ingredient" test in Section 7-9-3(M), "changed the test from one focusing on the end product's value to the purchaser to one focusing on the nature of seller's activity[ as well as] seller's relative investment

of skills and materials." *E G & G, Inc. v. Dir., Revenue Div. Tax'n & Revenue Dep't*, 1979-NMCA-139, ¶ 7, 94 N.M. 143, 607 P.2d 1161.

**{9}** Here, Taxpayer argues that "the provision of secured facilities for the confinement of inmates, rather than the performance of related services, was the predominant focus" of the contracts with the counties, and Taxpayer was therefore selling licenses for resale rather than selling services. This argument does not comport with the above-stated and longstanding focus on the *nature of the seller's activity* rather than that seller's intended result for the purchaser in determining whether a service is being provided by a seller. *See id.*; § 7-9-3(M). Moreover, Taxpayer's assertion is undercut by the AHO's findings—which are supported by the record on appeal—that demonstrate the number and nature of the services necessary for Taxpayer to provide such facilities for the confinement of inmates, as well as the lack of evidence demonstrating that the focus of the contracts was the sale of licenses. In its decision, the AHO stated,

> [T]he contracted services Taxpayer provided are critical to providing a functioning and lawful correctional facility. Without trained guards, security protocols, and maintained premises, a jail cannot meet its essential function as a secure detention facility. Nor can a correctional facility meet its rehabilitation purpose without the programming services contained in [the contracts]. Without appropriate medical care, legal visits, and court transportation services, a correctional facility cannot comply with its legal obligations. Without all of those services, the ostensible license that Taxpayer claims would be meaningless for the purposes of housing NMCD prisoners because there would not be a functional correctional facility.

Indeed, Taxpayer does not dispute the fact that the contracts with the counties involved the sale of services, but it argues that the provision of such services is merely a necessary component of Taxpayer's broader contractual obligation to provide facilities for the confinement of inmates. Upon review of the record before us, and in light of the AHO's thorough and well-supported decision—as well as the relevant portion of *CCA of Tennessee I* and the underlying AHO decision that was ultimately affirmed in *CCA of Tennessee II*, ___-NMSC-___, ¶¶ 7, 28—we discern no error on the part of the AHO in determining that the contracts between Taxpayer and the counties involved predominantly the sale of services rather than the sale of licenses, thus precluding Taxpayer from the deduction afforded by Section 7-9-47.

**{10}** We turn next to the second issue, this now fully controlled by *CCA of Tennessee II*, that is, whether the AHO erred in finding that the safe-harbor provisions of Section 7-9-43(A) were unavailable to Taxpayer because Taxpayer did not receive the NTTCs in good faith. As explained by our Supreme Court in *CCA of Tennessee II*, "[a]n NTTC establishes a taxpayer's entitlement to claim a deduction for the gross receipts it receives from the sale of certain licenses or services." ___-NMSC-___, ¶ 1. *CCA of Tennessee II* further explains:

The issuance of an NTTC for such sales is predicated on the buyer reselling the license or services it purchased from the taxpayer. When the taxpayer accepts a properly executed NTTC in good faith, the NTTC is conclusive evidence that the proceeds are deductible from that taxpayer's otherwise taxable gross receipts. Generally speaking, this provides the taxpayer with safe harbor protection from liability for payment of gross receipts tax in situations where, unbeknownst to the seller, the buyer is not reselling the license or services in the intended manner.

*Id.* (citations omitted); *see* § 7-9-43(A).

**{11}** In *CCA of Tennessee II*, the Court clarified that "[t]he purpose of the safe harbor provision[ of Section 7-9-43(A) is] to protect sellers whose products or services are initially sold to buyers for a nontaxable purpose but where, unbeknownst to the seller, the buyers do not actually use those products or services in the required manner." *CCA of Tennessee II*, ___-NMSC-___, ¶ 16. Such is not the situation here. Rather, here, Taxpayer sought authorization from the Department for the counties to be permitted to issue NTTCs to Taxpayer. Typically, government entities were not permitted to execute NTTCs, but the Department informed Taxpayer that it would allow the counties to issue the NTTCs based on the Department's review of Taxpayer's documentation asserting that the contracts governed a lease for resale—which, as explained above, was not actually the case. The eventual audit of Taxpayer by the Department—the potential occurrence of which Taxpayer was aware—revealed that Taxpayer was billing NMCD directly rather than billing the counties. The Department ultimately concluded that Taxpayer was not protected by the safe harbor provision of Section 7-9-43(A) because there was no eligible underlying deduction that applied to Taxpayer's contracts with the counties, given that Taxpayer was billing NMCD rather than the counties.

**{12}** In its decision, the AHO found that Taxpayer, as the seller, did not in good faith accept the NTTCs, executed by the counties as the buyers, and therefore was not entitled to the deduction from gross receipts. The AHO's reasoning, in pertinent part, was as follows:

The buyer of a license, not the seller, is required to seek permission from the Department to issue a NTTC. Yet in this case it was Taxpayer as the seller of the ostensible license, not [the counties] as the buyers of the license, who went directly to the Department to seek approval for those counties to issue the correct type of NTTCs. Although not necessarily indicative of any bad-faith by either Taxpayer or the counties, it is hard to say that Taxpayer could develop a good faith belief that the buyer intended to use the seller's ostensible license in a nontaxable manner when the Taxpayer was aware that the counties were unable to use the NTTCs and it was Taxpayer as the seller rather than the buyer that solicited permission from the Department to authorize the sellers to issue NTTCs. In this situation, where it was the seller of the goods that sought permission from the Department for the buyer to issue the NTTC, the

purpose of that safe harbor protection . . . cannot be fully achieved. Thus, even if the safe harbor provision could render a taxable transaction not supported by applicable deduction into [a] non[]taxable transaction by mere possession of a NTTC, giv[en] the timing and circumstance of the NTTCs in this case, Taxpayer could not develop the good faith protection contemplated under the structure and purpose of the safe harbor provision.

Because Taxpayer did not establish it was entitled to the Section 7-9-47 deduction, the transaction is not covered by a recognized deduction and Taxpayer cannot rely on its acceptance of the NTTC to convert this taxable transaction into a nontaxable transaction.

(citations omitted). In reviewing the AHO's decision regarding this issue, we turn to the objective standards set forth by *CCA of Tennessee II* concluding that "the applicable legal standard is an objective one, where the determination of whether a taxpayer accepts an NTTC in good faith is based on the facts and circumstances reasonably known to the taxpayer at the time it accepted the NTTC." *CCA of Tennessee II*, ___-NMSC-___, ¶ 25. As the Court explained in *CCA of Tennessee II*,

[t]he good faith standard in the safe harbor provision in Section 7-9-43(A) protects sellers from tax liability when buyers do not use goods or services in the intended manner. It does not protect a seller who is fully aware that the goods or services it sells are not being utilized by the buyer in the manner justifying the issuance or execution of the NTTC. This is an objective standard, based on the facts and circumstances reasonably known to the taxpayer at the time of the transaction. It relies on the ordinary meaning of "good faith," which here is most simply expressed as honesty in belief or purpose.

*Id.* ¶ 22. Further, "[t]he administrative regulations for gross receipts taxes support the inference that the Department understands that the term 'good faith' in Section 7-9-43(A) requires an objective review of the facts and circumstances known to the seller at the time it accepted the NTTC. This approach is consistent with prior case law, where facts and circumstances reasonably known to the taxpayer were part of the good faith analysis under Section 7-9-43(A)." *CCA of Tennessee II*, ___-NMSC-___, ¶ 17.

**{13}** *CCA of Tennessee II* establishes an additional consideration significant to the instant appeal: there, the Court held that the taxpayer did not accept the NTTC in good faith based in part on facts demonstrating that the taxpayer (1) "knew that there was no resale of services or a license because it was directly billing the [United States] Marshals Service" rather than the counties, and (2) "that the Marshals Service was paying" the taxpayer directly. *Id.* ¶ 27. Similarly, here, the record reflects that Taxpayer reasonably knew there was no resale of services or a license to the counties, given that Taxpayer was billing NMCD rather than the counties, and NMCD was paying Taxpayer. We consider these facts, although not relied on by the AHO, to be persuasive,

especially in light of *CCA of Tennessee II*, which was filed after the AHO's decision in this case. *See Tucson Elec. Power Co. v. Tax'n & Revenue Dep't*, 2020-NMCA-011, ¶ 6, 456 P.3d 1085 ("We may affirm the AHO's ruling on a ground not relied upon by the AHO if reliance on the new ground would not be unfair to [the t]axpayer."). Under the new authority of *CCA of Tennessee II*, we discern no basis upon which we could reverse the AHO's decision. *See* ___-NMSC-___, ¶ 10. Indeed, the record reflects the following: (1) Taxpayer requested approval from the Department for the counties—who were not otherwise typically permitted to do so—to issue NTTCs; (2) the Department's approval of such request was premised upon Taxpayer's representations that the contracts with the counties related to a lease for resale; and (3) the eventual audit of Taxpayer revealed that Taxpayer was billing NMCD, and not the counties, for its performance of the contract terms. Under our principles of administrative appellate review as well as the new precedent of *CCA of Tennessee II*, we conclude there to be no error in the AHO's determination that, on these particular facts, Taxpayer failed to demonstrate its entitlement to the protection afforded by the safe harbor provision of Section 7-9-43(A).

{14}  Turning now to the final issue raised by Taxpayer, we address whether the AHO erred in finding that Taxpayer was not entitled to equitable relief. Taxpayer argues that the Department was equitably estopped from conducting the audit and assessment that ultimately led to the Department's conclusion that Taxpayer was not eligible to claim a deduction under Section 7-9-47. Taxpayer contends that "right and justice demand" equitable relief in this case, given that Taxpayer reasonably relied on the Department's initial approval of Taxpayer's claim of the Section 7-9-47 deduction. *See Waters-Haskins v. N.M. Human Servs. Dep't*, 2009-NMSC-031, ¶ 23, 146 N.M. 391, 210 P.3d 817. Taxpayer focuses its assertion on the length of time Taxpayer relied on the Department's approval of Taxpayer's claimed deduction, which, at most, was over three years.

{15}  "We generally disfavor applying the doctrine of equitable estoppel against the [s]tate. The doctrine is rarely applied against the [s]tate and then only in exceptional circumstances where there is a shocking degree of aggravated and overreaching conduct or where right and justice demand it." *Id.* ¶ 16 (internal quotation marks and citation omitted). Where equitable estoppel might be applied against the state,

> [t]he essential elements that apply to the state agency to be estopped are (1) the agency's conduct amounting to a false representation or concealment of material facts or, at least, that is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the agency's intention, or at least expectation, that the other party will act upon such conduct; and (3) the agency's knowledge, actual or constructive, of the real facts. The essential elements that apply to the party raising equitable estoppel as a defense are (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance upon the

conduct of the party estopped; and (3) action based thereon of such a character as to change his position prejudicially.

*Id.* ¶ 22 (citations omitted) (text only).

**{16}** Here, the AHO ultimately concluded that equitable relief was unavailable to Taxpayer because Taxpayer had failed to demonstrate that the Department engaged in a shocking degree of aggravated overreach. The AHO stated,

> The [AHO] certainly agrees with Taxpayer that the Department's handling of this situation does not represent reliable tax policy or consistent tax administration. However, poor decision-making and inconsistent policy applications do not amount to the type of affirmative misconduct or rise to the level of aggravated overreach needed to support equitable estoppel against the government, especially regarding the non[]discretionary act of pursuing a tax liability.

Indeed, even if a party were to satisfy all of the above-stated elements as set forth in *Waters-Haskins*, 2009-NMSC-031, ¶ 22, to justify the application of the doctrine of equitable estoppel against the Department, there must also exist some demonstration that the Department engaged in a "shocking degree of aggravated and overreaching conduct" or that "right and justice demand it." *See id.* ¶ 23 (internal quotation marks and citation omitted). Here, we find no evidence of such conduct, and are unpersuaded by Taxpayer's argument that the length of time between the Department's initial approval of Taxpayer's claimed deduction and ultimate assessment indicates as much. In *Waters-Haskins*, on which Taxpayer relies, the taxpayer unknowingly received overpayment in food stamp benefits for approximately eight years based on the Department's mistaken conferring of such benefits and a change in status that did not obviously impact eligibility for the program. *Id.* ¶¶ 23, 29, 31. By contrast, Taxpayer received overpayment in the form of entitlement to deduction for what it asserts was approximately three-and-a-half years based on the Department's mistaken approval. Moreover, the record does not reflect further affirmative misconduct or error by the Department following its initial erroneous approval of Taxpayer's claimed Section 7-9-47 deduction. In fact, in making the initial but incorrect decision to approve the refund claim, the Department appeared to engage in a reasoned process with high-level management to analyze both the factual and legal issue. We acknowledge—as did the AHO—the unfortunately flawed application of the Department's policies in this case, yet we remain unpersuaded that Taxpayer has demonstrated a shocking degree of aggravated and overreaching conduct by the Department or that right and justice demand the application of estoppel. We therefore discern no error in the AHO's decision that, under the facts of this appeal, Taxpayer is not entitled to equitable relief.

**CONCLUSION**

**{17}** For the above reasons, we affirm.

**{18}**   IT IS SO ORDERED.

**J. MILES HANISEE, Judge**

**WE CONCUR:**

**KRISTINA BOGARDUS, Judge**

**KATHERINE A. WRAY, Judge**